Pursuant to the memorandum filed herein on this date,

IT IS HEREBY ORDERED that defendants' motion for leave to amend answer be and it is granted. Accordingly, the Court Clerk is instructed to file defendants' amended answer attached to their motion for leave to amend answer.

IT IS FURTHER ORDERED that defendants' motion for summary judgment be and it is granted.

In light of the above holdings,

IT IS HEREBY ORDERED, ADJUDGED and DECREED that judgment in this matter be awarded in favor of defendants and against plaintiff.

Alan H. AGEE, et al., Plaintiffs,

v.

ARMOUR FOODS COMPANY, Defendant.

No. 84–6051–CV–SJ–6.

United States District Court,
W.D. Missouri,
St. Joseph Division.

Dec. 12, 1986.

Paul L. Wickens, Lisa A. Weixelman, Sherman, Wickens, Lysaught & Speck, P.C., Kansas City, Mo., for plaintiffs.

Allan L. Bioff, Brian J. Finucane, Kansas City, Mo., for defendant.

## ORDER

SACHS, District Judge.

On February 17, 1983, Armour Food Co. (Armour) announced the sale of its St. Joseph, Missouri, meat processing plant to the Swift Independent Packing Co. (SIPCO). The sale was completed on June 2, 1983, Armour closed the plant on Friday, August 19, 1983, and SIPCO reopened it the following Monday, August 22. Plaintiffs were all non-union, salaried employees of the Armour Food Company at its St. Joseph plant.

Plaintiffs' suit is based on defendant's refusal to pay separation and vacation benefits which plaintiffs claim were due under Armour personnel policies as embodied in its personnel manual. The complaint is in seven counts, five of which are state law claims: breach of contract, state statutory wage payment claim (R.S.Mo. § 290.110 (1972)), promissory estoppel, fraudulent

misrepresentation, and prima facie tort. Additionally, plaintiffs assert claims in Counts VI and VII under 29 U.S.C. § 1132, the Employee Retirement Income Security Act (ERISA). Presently before the court is defendant's motion for summary judgment on all counts. There existing no genuine issue of material fact, this case may be decided by summary judgment.

Armour personnel policy was enunciated in its Personnel Policies Manual. As the Armour company president explained in his letter of introduction to the January 1983 revisions to that manual, it was to be used as a management tool, a reference source in management's discussions with its non-union employees "to ensure there is no misunderstanding or mystery about Company personnel policy, practice, or procedure." It was not to be used as an employee handbook and was not generally distributed to employees. It was, however, in the possession of some of the plaintiffs in their managerial or clerical capacities.

Changes were effected in the personnel manual in the year relevant to our inquiry. In July 1980 the Armour personnel manual reflected the following policies regarding separation and vacation benefits:

### TERMINATION OF EMPLOYMENT (§ 4100)

**POLICY**

**Involuntary Terminations**

An employee termination is to be classified into one of six termination categories....

2. *Release*—An individual's employment is terminated by action of the Company and through no fault of the employee.

**Procedure**

*Separation Pay*—Separation pay will be granted to eligible full-time employees (part-time and temporary employees are not eligible for separation pay) who are released by action of the Company and through no fault of their own.

\*       \*       \*       \*       \*       \*

Payment to employees transferring to the purchasing employer as a result of the sale of a unit of the business is dependent upon terms of sale and other circumstances. No payment is to be made in such cases without approval of the Vice President of Personnel and Employee Relations.

Separation pay wil *not* be granted to employees terminating for reasons such as, but not limited to, the following:

h. Reduction in force—If offered and refused a similar or comparable job with the Company or subsidiaries or with a successor company, or if there is continuity of employment with the successor company.

\*       \*       \*       \*       \*       \*

**Final Pay Procedures**

*Release*—The employee is to be paid to and including the last day worked plus any earned but unused vacation pay due at the time of termination. In addition, a separation allowance of four weeks or one week per year of service, to a maximum of 13 weeks, whichever is greater, will be made in a lump-sum payment.

### VACATION (§ 3100)

**Eligibility**

A regular full-time employee is eligible for two weeks' vacation after completing one year of full-time continuous service with the Corporation. This means that any regular full-time salaried employee on the active payroll at the end of the last day of the calendar year is entitled to a vacation with pay during the following calendar year....

**Service Terminations**

*Quit, Discharge or Release*

When an employee leaves the service of the Company, that employee is to receive pay for any vacation for which there is eligibility at the time of termination.

In March 1983 Armour issued various revisions to its personnel manual.[1] These

---

1. There were revisions in February, immediately after announcement of the sale to SIPCO, but none of those changes are relevant here.

revisions were back-dated to January 1983 and include in relevant part the following:

## TERMINATION OF EMPLOYMENT (§ 4100)

### POLICY

*Company Initiated Termination*

A Company initiated termination of employment is identified as a Release or a Discharge ...

*Termination Categories*

All Terminations should be identified as one of the six following categories....

2. Release—An individual's employment is terminated by action of the Company for reasons such as:

   a. Reduction in force ...

**Separation Pay Policy**

Separation pay is payable to those full-time employees who are terminated as a reuslt of an action of the Company which is categorized as a *Release.* Employees terminated under any other termination category are *not* eligible for separation pay....

Payment to an employee transferring to a successor employer as a result of the sale of a unit of the business is dependent upon terms of sale and other circumstances. No payment is to be made in such cases without approval of the Vice President/Employee Relations.

### PROCEDURE

**Final Pay**

*Release*—The employee is to be paid to and including the last day worked plus any earned but unused vacation pay due at the time of termination. In addition, the appropriate separation allowance will be made in a lump-sum payment.

## REDUCTIONS IN FORCE (§ 4110)

**Procedure**

\* \* \* \* \* \*

8. Individuals who are not offered assignments will be terminated as a release and will be eligible for separation pay.

## VACATION (§ 3100)

### POLICY

**Eligibility**

Any regular full-time salaried employee on the active payroll ... at the end of the last day of the calendar year is entitled to a vacation with pay during the following calendar year....

### PROCEDURE

**Terminations**

*Quit, Discharge or Release*

When an employee leaves the service of the Company, that employee is to receive pay for any vacation for which there is eligibility at the time of termination.

Finally, in June 1983 Armour issued its final personnel policy changes. They included:

## TERMINATION OF EMPLOYMENT (§ 4100)

### POLICY

\* \* \* \* \* \*

*Company Initiated Termination*

A Company initiated termination of employment is identified as a Release or Discharge....

*Termination Categories*

All terminations should be identified as one of the six following categories....

2. Release—An individual's employment is terminated by action of the Company for reasons such as:

   a. Reduction in force or job elimination ...

*Separation Pay Policy*

To be considered for separation pay a full-time employee must be terminated as a result of an action of the Company which is categorized as a *Release.* Employees terminated under any other termination category are not eligible for separation pay....

Even though released, no separation pay is to be paid to a terminated employee who is offered employment by a purchaser of the assets of a unit of the Company's business or by any employer who otherwise acquires and continues opera-

tion of a unit closed by Armour Food Company.

**PROCEDURE**

\* \* \* \* \* \*

*Release*—The employee is to be paid to and including the last day worked plus any earned but unused vacation pay due at the time of termination. In addition, the appropriate separation allowance will be made in a lump-sum payment.

No revisions were made to the vacation procedures at this time.

All but two of the original plaintiffs are employees who were offered and accepted employment with SIPCO.[2] Most of the plaintiffs began work with SIPCO within the equivalent of a weekend after the plant closed, and thus had no period of unemployment. All those who did not were at work with the new employer by October 19. Armour interpreted its separation pay policy to deny benefits to any employee who took a job with SIPCO and suffered no period of unemployment. Those employees who were hired by SIPCO but were unemployed for a time through no fault of their own were to be offered separation pay for that period. (Miller affidavit at 7–8; Tunnell depo. at 243–44.) All separation benefits were contingent upon the employee's furnishing proof by affidavit of having received no offer of employment by SIPCO. No employees received the vacation pay claimed here, although they were paid for days which were previously due.

In support of their claim for separation benefits, plaintiffs argue that the change in the language of the separation pay policy effectuated in June 1983, stating that no separation pay would be paid to a terminated employee offered employment by a purchaser of the unit, deprived them of separa-

tion pay benefits for which they were eligible under the 1979–80 policy statement. Defendant responds that company separation pay practice was not altered by this language change, but rather the new language was merely a clarification of pre-existing policy. (Miller affidavit at 5, ¶ 12.)

Plaintiffs further claim that under all editions of the personnel manual, they were entitled to payment for a prorated portion of their vacation earned in 1983.[3] As they interpret the language of the policy statement, they had earned, but not used, seven and one-half months' vacation pay at the time of their termination and were thus entitled to payment for those months.

Armour interpreted its policy to grant vacation pay only to those terminated employees who were "eligible" to take the vacation for which the pay was claimed. Eligibility was defined in the manual, as noted above, as being a full-time salaried employee on the active payroll at the end of the last day of the calendar year. Since these plaintiffs were not "eligible" under this definition, their vacation pay claims were denied.

■ Armour advances its motion for summary judgment on plaintiffs' state law claims by asserting that they are all preempted by ERISA. This is a correct assessment of the law on four of the five state law counts.[4]

There is no contention in this case that ERISA does not encompass the benefit plan at issue. Congress defined the scope of the Employee Retirement Income Security Act as covering "employee benefit plans." 29 U.S.C. § 1003(a). Such a plan is defined in 29 U.S.C. § 1002(1):

---

**2.** Georgia Hathorne was originally a plaintiff in this case but accepted offered judgment on October 16, 1985. She did not receive an offer of employment from SIPCO but until November 1984 did not furnish Armour with the affidavit to this effect which it required for payment of separation pay and thus did not receive such pay. A judgment has been entered in her favor, and she is not one of the plaintiffs dealt with in this motion. James Grant received no offer of employment and received the maximum of 13 weeks' separation pay from Armour.

**3.** There is no claim that Armour changed vacation pay policy at any time in a way which would affect any of the issues in this case.

**4.** Defendant's argument that all state counts must fail for alternative reasons need not be reached, as I find these counts to be preempted by the federal statutory scheme.

(1) The terms "employee welfare benefit plan" and "welfare plan" mean any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer ... to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries ... (A) medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment, or vacation benefits ... or (B) any benefit described in section 186(c) of this title....

Section 186(c) specifically mentions severance and vacation benefits. The Department of Labor regulations state that "the effect of section [1002(1)(B)] is to include within the definition of 'welfare plan' those plans which provide holiday and severance benefits, and benefits which are similar." 29 C.F.R. § 2510.3–1(a)(3). The Armour plan meets these definitions and is, therefore, governed by federal law. Congress further provided for federal preemption in cases involving employee welfare benefit plans covered by ERISA:

Except as provided in subsection (b) of this section, the provisions of this subchapter and subchapter III of this chapter shall supersede any and all State laws insofar as they may now or hereafter *relate to* any employee benefit plan described in section 1003(a) of this title and not exempt under section 1003(b) of this title.

29 U.S.C. § 1144(a) (emphasis added). This preemption was recognized by the Eighth Circuit Court of Appeals in *Dependahl v. Falstaff Brewing Corp.*, 653 F.2d 1208, 1215 (1981) ("Although preemption is not lightly inferred, the broad scope of the substantive provisions of ERISA, combined with the explicit statement of federal preemption in section 1144, leads us to conclude that Congress intended to 'occupy the field' of employee benefit plans"), *cert. denied*, 454 U.S. 1084, 102 S.Ct. 641, 70 L.Ed.2d 619 (1981).[5]

Arguing against preemption of their state law claims, plaintiffs urge the court to find that defendant's actions do not "relate to" the administration of the employee benefit and vacation plans specifically, as statutorily required for preemption, but to a "scenario" orchestrated by defendant, wherein Armour created a "captive audience of prospective employees for SIPCO to interview and hire if it so desired." (Plaintiffs' Response to Defendant's Motion for Summary Judgment, at 47). They cite *Scott v. Gulf Oil Corp.*, 754 F.2d 1499 (9th Cir.1985), as authority.[6] *Scott* is clearly distinguishable. In that case, the defendant employer had negotiated with the purchasing entity to hire its employees on terms which the employees claimed were detrimental to them. Plaintiffs alleged tortious conduct in two respects: the wrongful conduct of their former employer deprived them of separation benefits both under its own benefit plan and that of their new employer. The *Scott* court held plaintiffs' claims for separation benefits under their former employer's plan preempted, since the conduct complained of related to administration of that ERISA-covered benefit plan. Claims not preempted were

---

5. Since there is no question in this case of the benefits at issue being regulated by state insurance, banking or securities law, there is no need to inquire past the initial stage of the preemption analysis established in *Metropolitan Life Ins. Co. v. Massachusetts,* 471 U.S. 724, 105 S.Ct. 2380, 85 L.Ed.2d 728 (1985). The only question before us is whether established state common law "relates to" the employee benefit plan at issue. If so, that law is preempted. The term "relates to" is to be given its plain meaning of having "a connection with or reference to such a plan." *Shaw v. Delta Air Lines, Inc.,* 463 U.S. 85, 96–97, 103 S.Ct. 2890, 2900, 77 L.Ed.2d 490 (1983).

6. Although ERISA by its terms preempts *laws* which relate to employee benefit plans (both statutory and decisional, 29 U.S.C. § 1144(c)(1)), and plaintiffs' argument focuses on defendant's *actions,* the *Scott* court explained that

preemption of state law claims by ERISA depends on the conduct to which such law is applied, not on the form or label of the law.... Therefore, in determining whether each of plaintiffs' claims is preempted by ERISA, we inquire as to whether the conduct challenged by each claim was part of the administration of an employee benefit plan. 754 F.2d at 1504–05 (citations omitted).

those concerning the loss of benefits with the new employer. These benefits were not covered by ERISA, precisely because they did not exist. Here, there apparently were no such negotiations between Armour and SIPCO. Plaintiffs do not complain that Armour's acts deprived them of benefits under SIPCO employment. The gravamen of the acts plaintiffs complain of is that defendant changed its own rules of separation pay just before their termination, depriving them of benefits previously held, and misinterpreted the personnel manual regarding vacation pay. These acts, whether couched in terms of contract breach; failure to pay wages due under statutory obligation; promissory estoppel; or prima facie tort, plainly "relate to" the administration of the ERISA-covered Armour employee welfare plan. Plaintiffs' claims under Counts I, II, III and V are, therefore, preempted.

■ Count IV of plaintiffs' complaint alleges fraudulent misrepresentation by defendant, to the effect that plaintiffs would have benefits equal to or better than defendant's union employees. Plaintiffs claim to have decided not to unionize or seek other employment based on these representations. To the extent that this count alleges acts that "relate to" defendant's administration of its benefit plan, it, too, is preempted by federal law. To the extent that these representations were independent of the employee welfare benefit plan administration, and were made solely for the purpose of preventing plaintiffs' unionization or seeking other employment, however, they are not preempted. Defendant argues that, even if these claims are not considered "a repeat of separation and vacation pay claims," and this claim is not preempted, it must fail because plaintiffs have failed to specify what representations were made, when, and to whom; that plaintiffs have only vaguely referred to "various documents and brochures shown to them over the course of their employment and vaguely recall various conversations

wherein their benefits were described or explained to them." Defendant argues that these allegations lack the required specificity to support a claim for fraudulent misrepresentation and that, in the face of written policy of the company to which employees had access, any reliance upon such representations was not reasonable.

Materials have been supplied in Exhibit 27 to plaintiffs' response to defendant's motion for summary judgment that are identified as supportive of the fraud claim by plaintiffs. Only seven of the 29 plaintiffs apparently had any recollections of identifiable events assertedly showing fraud as to them. A review of the material will show its quality.

Plaintiff Koranda testified that Jack Forst of Armour told him "sometime between 1969 and 1983" that "salaried employees would receive benefits equal to or better than those provided to hourly union employees." Dep. 173–4. Before he was employed, plaintiff Ray recalled, Al Drain, former president of the company, wrote a letter that "in effect said that no salaried people would be pensioned or severed with any less benefits than the hourly people." Dep. 109.[7] After his employment, however, Ray was aware of "different benefit packages." *Id.* During a union organizing campaign, plaintiff Agee testified, unknown persons said "fringe benefits would always be as good or better than those of the union if they did not unionize." Dep. 139. Plaintiff Blaha remembered that many years ago, "1960ish," "Chicago personnel at the time of the union vote" said that benefits of salaried employees would be "not less than those of unionized employees." Dep. 126. Plaintiff Hathorne remembered that in the late 1950s or early 1960s, "Mr. Schmitt, our office manager," urged her "not to join the union because the benefits for the office personnel would be better or as good as the union." Dep. 46. Plaintiff Baach named five Armour employees in as many cities who assured

---

7. A copy of the letter seems not to have been supplied by the parties. Loose recollections of the letter would probably be inadmissible. The letter is not alleged to have been fraudulent, in any event, as Count IV is based on "certain oral representations to plaintiffs." ¶ 57, Second Amended Complaint.

him that "fringe benefits would always be better than those of the union if you did not unionize." Dep. 127. He was told that "salaried guys are always going to be taken care of better than those union guys." Dep. 130. The only dates given for the conversations were in 1963–5. Dep. 127. Plaintiff Brushwood was told by a Mr. Gittner in 1976 that "salaried employees would be the same or better in treatment than union employees were." Dep. 17.

The United States Supreme Court has held that on motion for summary judgment, "the burden on the moving party may be discharged by 'showing'—that is, pointing out to the District Court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). This Armour has done. Further, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* 106 S.Ct. at 2552–53.

Under Missouri law, plaintiffs must prove the following in order to prevail on their fraud claim: "a representation, its falsity, its materiality, the speakers [sic] knowledge thereof, his intent it should be acted upon, the hearer's ignorance of the falsity, his reliance on the truth of it, his right to so rely, and his injury." *Perma Greetings, Inc. v. Russ Berrie & Co., Inc.*, 598 F.Supp. 445 (E.D.Mo.1984). "The burden is on the plaintiff to establish a submissible case of fraud, and failure as to any one essential element is fatal to the entire claim." *Craft v. Metromedia, Inc.*, 766 F.2d 1205 (8th Cir.1985).

■ A serious question of reasonable reliance on these stale assertions is presented by the Ray testimony and other materials, including plaintiffs' contention that they relied on the 1980 plan. The material is wholly conclusory and generalized, proba-bly because it relates to purported events a decade or more ago. It is well settled that "mere statements of opinion, expectations and predictions for the future are insufficient to authorize a recovery" for fraud. *Lowther v. Hays*, 225 S.W.2d 708, 714 (Mo. Sup.1950). There is a presumption of honesty and fair dealing which bars from the jury a claim of fraud that is no more than a breach of expectations, based on assurances not shown by other circumstances to have been contrary to the speaker's intentions. The material presented is substantially less probative of fraud than plaintiff presented in the well-known case of Christine Craft, *supra*, where a panel of appellate judges, including two who are well-steeped in Missouri jurisprudence, held that a submissible case had not been made. Summary judgment is proper, therefore, on Count IV of plaintiffs' complaint.

Count VI is framed as a contract claim, brought pursuant to 29 U.S.C. § 1132, which allows a participant or beneficiary to sue for benefits due under a covered plan. Plaintiffs correctly point out that the mere invocation of ERISA does not necessarily negate a claim otherwise cognizable under state law; rather, it dictates that federal law shall be used to decide the claim. And where, as here, federal law does not provide a substantive rule, the federal courts are empowered by Congress to create federal common law to bridge the gap. *Massachusetts Mutual Life Ins. Co. v. Russell*, 473 U.S. 134, 105 S.Ct. 3085, 3097–98, 87 L.Ed.2d 96 (1985) (Brennan, J., concurring); *Landro v. Glendenning Motorways, Inc.*, 625 F.2d 1344, 1351 (8th Cir.1980) ("[I]n order to fill the gaps left by ERISA's express provisions, Congress 'intended that a body of Federal substantive law will be developed by the courts to deal with issues involving rights and obligations under private welfare and pension plans'") (quoting Senator Javits). In this regard, it is well settled that federal courts will not disturb the decisions of administrators of an employee welfare benefit plan such as this unless those decisions were arbitrary or capricious.[8] *Central Hardware Co. v.*

**8.** Plaintiffs suggest that the court look to state law decisions in formulating federal common

*Central States, Southeast and Southwest Areas Pension Fund,* 770 F.2d 106 (8th Cir.1985); *Quinn v. Burlington Northern, Inc. Pension Plan,* 664 F.2d 675 (8th Cir. 1981), *cert. denied,* 456 U.S. 928, 102 S.Ct. 1976, 72 L.Ed.2d 444 (1982).

Plaintiffs maintain that Armour's actions should be judged by a higher standard than the deferential arbitrary and capricious standard. In support of this contention, they refer the court to *Struble v. N.J. Brewery Employee Welfare Trust Fund,* 732 F.2d 325 (3d Cir.1984). In that case, the Third Circuit applied a stricter, fiduciary standard to the administrator's action. This action, the vote by trustees of a fund to return a surplus of premiums to the employer group rather than increasing funding for the employees' welfare plan, was considered appropriate for measurement against a fiduciary standard. The decision was based upon a determination that this standard is the proper one in cases where "the issue is whether the trustees have sacrificed the interests of the beneficiaries as a class in favor of some third party's interests." *Id.* at 333. In cases in which the issue was "the legality of the trustees' decision to deny benefits to particular claimants," *id.,* the arbitrary and capricious standard was acknowledged as appropriate. In these situations, the rights of all beneficiaries under the plan must be balanced, and the courts have uniformly refused to second-guess the decisions of the plan administrators. Plaintiffs attempt to bring their claim within the former class of cases by contending that this was not a situation in which competing claims of beneficiaries had to be weighed. Rather, they insist that the fund administrators were managing the plan to the detriment of all

Armour employee beneficiaries and in favor of the company, a nonbeneficiary.

■ Plaintiffs' own proof shows this to be erroneous. In its Exhibit 2 to Exhibits in Support of Plaintiffs' Response to Defendant's Motion for Summary Judgment, plaintiffs supply a partial response of defendant to plaintiff Koranda's first set of interrogatories. This is, in part, a list of all persons employed by Armour Food Co. since January 1, 1982, who received separation pay. Armour's response is a two-page list of approximately 100 persons who received separation pay between October 1982 and October 1983. Armour was clearly in the process of balancing competing claims of its employees, accepting some while rejecting others. Thus, even under the logic of *Struble,* the administrators' decisions must stand unless arbitrary or capricious.

Defendant claims that its practice under the separation and vacation pay policies at issue did not change after 1979, even after the alteration of the policy language in June 1983. (Miller affidavit, ¶ 14 at 5.) Separation pay benefits were always denied to those employees who accepted offers of employment by a purchasing entity. If there were a lapse in employment, not attributable to the employee, separation pay was available to tide the employee over that period. (Miller affidavit at 5–12.) Vacation pay was unavailable to employees not "eligible" to take that vacation at the time of termination. Eligibility was determined as of December 31. Plaintiffs do not seriously controvert these claims.[9] Rather, they maintain that Armour failed to read its policy manual in a fair or rea-

---

law. They cite *Hinkeldey v. Cities Service Oil Co.,* 470 S.W.2d 494 (Mo.1971), as authority for Missouri's prior determination of the issues at hand. Federal courts have not looked to state law for principles in forming federal common law on the question of judging administrators' actions in benefit determinations under employee welfare benefit plans. Rather, they have developed the arbitrary and capricious standard. Assuming, *arguendo,* that a contract such as plaintiffs allege existed between Armour and its employees, I decline to construe that contract, being guided by the clear development of

this federal standard. *Quinn v. Burlington Northern, Inc.,* 664 F.2d 675 (8th Cir.1981).

9. Plaintiffs contest defendant's assertion of consistent past practice only insofar as they claim that defendant has failed to provide records of separation benefits paid between 1979 and 1982. By separate order dated December 1, 1986, I held that defendant has substantially complied with the court's order to supply this information and thus find this argument unsupported by fact.

sonable way and thus their actions were arbitrary and capricious.

■ The Eighth Circuit Court of Appeals has identified various criteria by which to adjudge an administrator's acts arbitrary and capricious. Trustees who impose a standard not required by the plan itself act arbitrarily. *Morgan v. Mullins*, 643 F.2d 1320, 1321 (8th Cir.1981); *Maness v. Williams*, 513 F.2d 1264, 1267 (8th Cir. 1975); *Wilken v. AT & T Technologies, Inc.*, 632 F.Supp. 772, 774 (E.D.Mo.1984). *Morgan* adds that it is arbitrary and capricious for the trustees' interpretation of the plan to be inconsistent with the plain words of the document containing the plan's terms or if that interpretation frustrates the purpose of the plan or makes some of the words of that document superfluous. 643 F.2d at 1324. Even a consistent interpretation, if unreasonable from the beginning, is arbitrary and capricious. *Id.* at n. 4.

■ Even if the policy language at issue is susceptible of different interpretations, in considering these criteria I do not find that the reading given that language by defendant was unreasonable. The 1980 separation pay policy statement was to the effect that such pay was not available to terminated Armour employees who had "continuity of employment with the successor company." Although reasonable minds could differ as to the definition of "continuity of employment" and "successor company," it cannot be said that Armour's considering SIPCO as a successor company is unreasonable. On the contrary, it would appear that defendant "reached a logical conclusion when it determined that severance benefits for laid off employees were intended for employees who suffered at least some period of unemployment," and an interpretation of the plan that avoids an obvious "windfall" is not only fair but clearly reasonable. *Pabst Brewing Co. v. Anger*, 610 F.Supp. 214, 217 (D.Minn.1985), affirmed by per curiam opinion, 784 F.2d 338 (8th Cir.1986). Likewise, although "transfer" may at times be considered a term of art, Armour management would not have been unreasonable, nor would it

be contrary to the "plain words of the document," to interpret the movement of workers from their employ to that of another company in the very short time frame experienced by these plaintiffs, as a "transfer." In addition, it has been held that "severance pay is generally intended to tide an employee over while seeking a new job and should be considered an unemployment benefit." *Sly v. P.R. Mallory & Co.*, 712 F.2d 1209, 1211 (7th Cir.1983); *accord, Petrella v. NL Industries, Inc.*, 529 F.Supp. 1357, 1361 (D.N.J.1982). Thus, Armour's interpretation is consistent with the purpose of the severance plan, as well, and cannot be considered arbitrary or capricious.

Even under the 1980 policy language, therefore, Armour's denial of benefits to these plaintiffs would not have been arbitrary or capricious. Thus, even if defendant did change this policy language in anticipation of the plant sale, the change would not have deprived employees of benefits otherwise available to them under the interpretation given to the policy even before the change.

■ Likewise, it is not unreasonable to interpret the vacation policy to preclude the pro rata payment these plaintiffs seek. A released employee was entitled to receive pay for "any vacation for which there is eligibility at the time of termination." Eligibility was measured as of December 31. These plaintiffs were terminated in August and thus were not eligible for their 1983 vacation at the time of their termination. Such a reading of the policy is not unreasonable.

Plaintiffs argue that they cannot be charged with knowledge of written policies of which they were not provided a copy. Their depositions show, however, that they knew that the manual existed and that it would be used in answering any questions they might have regarding their benefits. (Defendant's Supplemental Record in Support of Motion for Summary Judgment.) Further, at least some of the plaintiffs actually possessed copies of the manual and were responsible for entering replacement pages when they were issued.

Finally, plaintiffs contend that, as in the case of *Blau v. Del Monte Corp.*, 748 F.2d 1348 (9th Cir.1985), the defendant here so "flagrantly flouted" reporting and disclosure requirements of ERISA as to amount to a substantive violation of that statute. This argument is based on the claim that "Armour made no attempt to report or disclose the information to Armour Employees." (Plaintiffs' Response to Motion for Summary Judgment, at 21.) The nondisclosure claim ignores the facts, noted above, that the manual itself encouraged Armour management to use that manual in administering personnel policy; the employees were aware that they could ask management about their benefits and receive answers from a written, official source; and that some of these plaintiffs themselves possessed or had access to a copy of the manual. In any event, the alleged procedural violations were not pleaded nor proven in this case and do not rise to the level of active concealment found in *Blau*. For the above reasons, I find that defendant's acts were not arbitrary or capricious and so did not constitute a violation of ERISA.[10]

Plaintiffs' Count VII is a claim for compensatory and punitive damages as a result of defendant's alleged breach of fiduciary duties owed to plaintiffs. This count is brought pursuant to 29 U.S.C. § 1132. This section of ERISA, in addition to providing for the availability of a civil suit to enforce contract obligations under § 1132(a)(1)(B), also provides for a civil suit

> by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan.

29 U.S.C. § 1132(a)(3). Additionally, a civil suit may be brought

> by the Secretary, or by a participant, beneficiary or fiduciary for appropriate relief under section 1109 of this title.

29 U.S.C. § 1132(a)(2).

The United States Supreme Court has recently held that suits brought under § 1132(a)(2), i.e., those to enforce the fiduciary breach provisions enunciated in § 1109, may be maintained by a beneficiary or participant, but all benefits from such a suit inure to the plan, not the individual. *Massachusetts Mutual Life Ins. Co. v. Russell*, 473 U.S. 134, 105 S.Ct. 3085, 3092, 87 L.Ed.2d 96 (1985) ("[T]he entire text of [§ 1109] persuades us that Congress did not intend that section to authorize any relief except for the plan itself"). The Court specifically left open whether such a suit for extracontractual damages could be maintained under § 1132(a)(3). At least two federal courts have since determined that such a suit is not possible. *Hancock v. Montgomery Ward Long Term Disability Trust*, 787 F.2d 1302, 1307 (9th Cir. 1986); *Bone v. Association Management Services, Inc.*, 632 F.Supp. 493, 496 (S.D. Miss.1986); *see also Quesnell v. Milwaukee Area Truck Drivers Health and Welfare Fund*, 624 F.Supp. 323 (E.D.Wis.1985); *Foltz v. U.S. News & World Report, Inc.*, 627 F.Supp. 1143 (D.D.C.1986) (contractual damages possible under § 1132(a)(3)).

Plaintiffs do not specify their rationale for invoking § 1132. If they claim violation of § 1109, the suit could not be maintained by these plaintiffs under *Massachusetts Mutual*. In any event, the litigation seems more soundly characterized as one presenting claims of individuals asserting entitlement under a plan and thus to be governed by the arbitrary and capricious standard used by Judge Jones in his companion case and by the district court and court of appeals in the *Pabst* case. The belated change in the plan may be disregarded, even if deemed questionable for a fiduciary, because it is concluded that the 1980 plan, fairly construed, supports de-

---

**10.** While not controlling, because the record may be significantly different, it is of interest that the result here reached is the same as that summarily reached by Judge Jones, in companion litigation in South Dakota. The court is aware that Judge Magnuson declined to enter summary judgment at an early stage of his companion case. The present case fulfills Judge Magnuson's requirement that an adequate record be supplied.

fendant. While appropriate as a clarification of wording, in a vain attempt to avoid argument, I do not find any substantive change in the plan.

ORDERED that defendant's motion for summary judgment on all counts is GRANTED.